UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| JANET PALMER as Personal, Representative of the Estate of Roy C. Palmer,<br><br>   Plaintiff,<br><br>  v.<br><br>UNITED STATES OF AMERICA,<br><br>   Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 1:23-cv-00027-SDN |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Janet Palmer as personal representative of the estate of her late husband, Roy Palmer, brings this medical malpractice wrongful death case against the United States pursuant to the Federal Tort Claims Act ("FTCA"). Mrs. Palmer filed her Complaint on January 12, 2023 (ECF No. 1). The Government admits that through the conduct of its employees and agents, while acting within the scope of their employment, it was negligent in its care and treatment of Mr. Palmer during his hospitalization at the Togus VA Medical Center (the "Togus VA") in Augusta, Maine, from April 6 to April 9, 2020. The parties agree that this negligence proximately caused Mr. Palmer's cardiac arrest on April 9, 2020, at the Togus VA and ultimately his death on April 30, 2020. The parties stipulate that Mr. Palmer's pecuniary losses total $453,066.71. The Court held a bench trial, *see* 28 U.S.C. § 2402, on January 27, 28, and 29, 2025, to determine the appropriate measure of damages for Mrs. Palmer's loss of the comfort, society, and companionship of Mr. Palmer and for Mr. Palmer's conscious pain and suffering that he experienced between April 9, 2020, and April 30, 2020. The parties agree Mr. Palmer suffered conscious pain and

suffering for a total of thirteen days within the twenty-one-day period between his cardiac arrest and his death. At trial, the Court heard the testimony of Plaintiff's expert witness, Dr. Stephan Mayer, and the Government's expert witness, Dr. Jeffrey Cohen. The Court also heard the testimony of fact witnesses Mrs. Palmer and Timothy Hutchinson, Jr., Mr. Palmer's grandson. Having carefully considered the evidence, I make the following findings of fact and conclusions of law.

## I.     Findings of Fact

Mr. Palmer was a veteran who served in the U.S. Army from August 31, 1970, to March 16, 1972. He was honorably discharged from the U.S. Army in March 1972.

Roy and Janet Palmer began a romantic relationship in May 2009 and started living together in October 2009. The Palmers married on October 18, 2016. Mr. and Mrs. Palmer had a loving partnership and enjoyed intimate relations throughout their relationship and marriage. The Palmers enjoyed spending time together doing activities such as taking walks outside, taking day trips, annually attending the Fryeburg Fair, playing bingo, cooking and sharing meals together, celebrating holidays and birthdays with family, and watching TV together, including NCIS, Chicago Fire, and televised NASCAR races.

On April 6, 2020, Mr. Palmer drove to the Togus VA with complaints of abdominal pain in the epigastric/peri-umbilical region. He was admitted to the Togus VA that day. On April 6, 2020, at 3:40 PM, a Togus VA hospitalist entered an order for Mr. Palmer to receive one milligram of intravenous ("IV") hydromorphone, an opioid, every two hours as needed. As of April 6, 2020, Mr. Palmer had not been prescribed any opioids for at least two years.

On April 7, 2020, Mr. Palmer continued to report pain. On April 7, 2020, at 02:03 AM, a Togus VA hospitalist entered a new order for Mr. Palmer to receive an immediate dose of two milligrams of IV hydromorphone and then receive two milligrams of IV hydromorphone every two hours as needed. If administered every two hours per this order, Mr. Palmer would receive twenty-four milligrams of IV hydromorphone in one twenty-four-hour period. As such, this dosage of hydromorphone triggered an automatic "alert" in the electronic medical system that notified the Togus VA hospitalist that the order would result in Mr. Palmer receiving more than the sixteen-milligram maximum daily dosage for hydromorphone. The Togus VA hospitalist manually overrode the alert. On April 7, 2020, Mr. Palmer received a total of sixteen milligrams of IV hydromorphone.

On April 8, 2020, Mr. Palmer received a total of twenty milligrams of IV hydromorphone. On April 8, 2020, at 11:07 PM, a different Togus VA hospitalist ordered thirty milligrams of Oxazepam, a benzodiazepine. Hydromorphone and Oxazepam have box warnings (formerly known as Black Box Warnings) specifically warning that the use of benzodiazepines and opioids together may result in profound sedation, respiratory depression, coma, and death. Box warnings are the highest safety-related warning that the Food and Drug Administration assigns to medications.

On April 9, 2020, at 12:12 AM, Mr. Palmer received thirty milligrams of Oxazepam. On April 9, 2020, at 01:58 AM and again at 04:12 AM, Mr. Palmer received two additional doses of IV hydromorphone (two milligrams each). On April 9, 2020, at 12:10 AM, Mr. Palmer's oxygen saturation level was 90%. After receiving both IV hydromorphone and Oxazepam early on April 9, 2020, Mr. Palmer's blood pressure dropped: at 12:10 AM, it was 172/84; at 02:06 AM, it was 109/71; at 04:21 AM, it was 103/62. During the time he

was treated at the Togus VA, Mr. Palmer was admitted to 4 South, a fourteen-bed overflow medical-surgical unit and did not have access to continuous vital sign monitoring.

On April 9, 2020, at 05:35 AM, Mr. Palmer was found not breathing and his heart was in asystole. The administered overdose of opioids (hydromorphone) in combination with a benzodiazepine (Oxazepam) caused Mr. Palmer to experience a respiratory driven cardiac arrest. His providers performed CPR until his pulse returned. Four minutes after his pulse returned, Mr. Palmer was intubated. After he was resuscitated, Mr. Palmer was transferred to Maine Medical Center ("MMC") in Portland on April 9, 2020.

When he arrived at MMC,[1] Mr. Palmer was diagnosed with "[c]ardiac arrest most likely secondary to hypoxia[2] from respiratory arrest following receiving high doses of benzos/opiates [sic]." After Mr. Palmer was transferred from the Togus VA to MMC, medical providers at MMC induced therapeutic hypothermia to attempt to reduce brain cell damage.[3] Because of COVID-19 restrictions, no family members, including Mrs. Palmer, were permitted to see Mr. Palmer on April 9, 2020, or any day thereafter with one exception.

Both parties' experts reviewed Mr. Palmer's medical records beginning with his visit to the Togus VA on April 6, 2020, to his admission to MMC on April 9, 2020, and through the end of Mr. Palmer's life on April 30, 2020, to evaluate whether and to what extent Mr. Palmer experienced conscious pain and suffering from the time of his cardiac arrest until his death. As evidence of consciousness, both experts looked to Mr. Palmer's

---

[1] Both experts agreed that MMC provided Mr. Palmer with excellent care throughout his time at MMC.
[2] Hypoxia occurs when there is "a deficiency of oxygen reaching the tissues of the body." *Hypoxia*, Merriam-Webster, https://perma.cc/T7P8-XNY2.
[3] Dr. Mayer explained that therapeutic hypothermia is employed to protect brain cells that have been injured by oxygen deprivation because the damage is greater at higher body temperatures and lowering the body temperature reduces the risk of damage.

ability to follow commands. Dr. Mayer described consciousness as awareness of the self and the environment that is mediated by the cortex or supratentorial[4] region of the brain (as opposed to the brain stem which controls autonomic functioning such as breathing). According to Dr. Mayer, following commands is evidence of consciousness because following a simple command requires hearing the command, understanding it, initiating a volitional response to the command, and performing the response. Dr. Mayer described following commands as evidence that demonstrates the "neurological circuitry" in the cortex is working. Dr. Cohen described consciousness as the ability to respond to external stimuli and also relied on notations of Mr. Palmer's ability to follow commands as evidence of consciousness.

Both expert witnesses agreed that Mr. Palmer experienced periods of both consciousness and unconsciousness throughout his treatment at MMC and both expert witnesses further agreed that Mr. Palmer never regained fully functioning or normal consciousness after his cardiac arrest. Dr. Mayer described Mr. Palmer's consciousness as liminal,[5] inconsistent, and in a grey zone. Dr. Cohen described Mr. Palmer's consciousness as fluctuating and waxing and waning throughout his time at MMC and analogized the ability to feel pain at such a level of consciousness as that of the ability of one who has drank excessive amounts of alcohol. Both expert witnesses agreed that it is

---

[4] "Supratentorial" denotes "cranial contents located above the tentorium cerebelli," *Supratentorial*, Stedman's Medical Dictionary 868210 (28th ed.), which itself is a
> strong fold of dura mater roofing over the posterior cranial fossa with an anterior median opening, the tentorial notch, through which the midbrain passes; the tentorium cerebelli is attached along the midline to the falx cerebri and separates the cerebellum from the inferior surface of the occipital and temporal lobes of the cerebral hemisphere.

*Tentorium cerebelli*, Stedman's Medical Dictionary 902470 (28th ed.).
[5] "Liminal" means "of, relating to, or situated at a sensory threshold[;] barely perceptible or capable of eliciting a response." *Liminal*, Merriam-Webster, https://perma.cc/MV5Z-EY3X.

more likely than not that Mr. Palmer did experience conscious pain and suffering between April 12 and April 18, and between April 22 to April 27, a total of thirteen days.

The experts agreed that Mr. Palmer did not experience any degree of consciousness, and therefore did not experience conscious pain and suffering, on April 9, 2020. On April 10, 2020, Mr. Palmer remained intubated and heavily sedated at MMC's Intensive Care Unit ("ICU") where he had a central venous catheter, an arterial line, a nasogastric tube, and an indwelling urinary catheter. Mr. Palmer did not experience conscious pain and suffering on April 10, 2020.

On April 11, 2020, after Mr. Palmer's period of therapeutic hypothermia was complete and while Mr. Palmer was still intubated, his medical providers began performing "wake ups" or "sedation vacations" every two hours in which they would stop his sedation and evaluate his neurologic status by checking his response to painful stimuli and commands. During wake ups on April 11, 2020, Mr. Palmer was observed to be uncomfortable, severely shivering, coughing in response to the intubation, and experiencing myoclonus, which are sudden, involuntary muscle jerks, spasms, and twitches. Mr. Palmer did not respond to commands on April 11, therefore neither expert concluded, under a more likely than not standard, that Mr. Palmer was conscious on April 11, 2020.

During wake ups on April 12, 2020, Mr. Palmer regained consciousness as evidenced by his ability to give a thumbs up in response to command, which was reproducible. When Mr. Palmer was conscious and off all sedation, medical staff observed him to be agitated and coughing around his intubation tube with an elevated heart rate and blood pressure. As a result of his suffering and distress, a new order was entered for Mr. Palmer to receive sedative medication.

Both experts testified that simply being in the ICU is distressing for patients because of the unusual and unfamiliar ICU environment, being connected to monitors, IVs, and catheters, strange alarms and beeping noises, disorientation from losing track of time, and isolation from loved ones. In addition, ICU patients can experience post-intensive care syndrome, which shares symptoms with post-traumatic stress disorder.

Both experts agreed that Mr. Palmer was conscious for at least portions of each day from April 12, 2020, through April 18, 2020, because he was following commands. Mr. Palmer likely was awake for about four to six hours on each day he was conscious. During the April 12 through April 18 period of consciousness, Mr. Palmer experienced pain, suffering, and distress from the following: periods of increased myoclonus and shivering; coughing around his breathing tube during periods of decreased sedation; receiving multiple enemas and undergoing a rectal exam; the indwelling catheter and central venous catheter; being trapped in an unfamiliar environment with an intubation tube down his throat; being poked and prodded by strangers; being unable to communicate; and being isolated from Mrs. Palmer and all other family and friends. Medical providers at MMC treated his pain, distress, and agitation with sedatives and pain medication when he appeared agitated, uncomfortable, or in pain. There are notations throughout Mr. Palmer's MMC medical records noting times when he appeared uncomfortable or in pain and also times when he appeared comfortable or denied being in pain.

On April 13, 2020, Mr. Palmer remained intubated but his ventilator was on continuous positive airway pressure ("CPAP") mode. In CPAP mode, the patient is doing most of the work of air movement and breathing. If the patient can tolerate CPAP mode for a prolonged period of time, that indicates that it is time to extubate the patient.

On April 14, 2020, Mr. Palmer remained intubated on CPAP mode. However, at 10:50 AM, Mr. Palmer's respiratory rate was abnormal and elevated, in the thirties,[6] he was tachycardic[7] with a heartrate in the 110s, and his oxygen saturation had decreased to the seventies. The respiratory therapist had to switch Mr. Palmer back to continuous mandatory ventilation. At 11:00 AM, medical staff observed Mr. Palmer to be agitated and choking on the intubation tube and trying to lift himself out of bed.

Mr. Palmer was extubated on April 16, 2020, but he remained unable to verbally communicate. On April 17, 2020, at 8:30 PM, Mr. Palmer experienced suffering and distress because he could not breathe properly as a result of thick, white secretions blocking his airway. Because he was experiencing difficulty breathing, his respiratory rate increased to thirty to thirty-five breaths per minute, his accessory muscles were visibly in use, and providers attempted nasotracheal[8] suctioning, but it was unsuccessful. Mr. Palmer's inability to clear his secretions caused distress and caused him to experience a sensation akin to drowning.

On April 18, 2020, Mr. Palmer remained unable to verbally communicate, but he was able to follow commands, demonstrating that he was conscious. Mr. Palmer's medical providers found it difficult to balance reducing his myoclonus with sedatives against overly sedating him.

---

[6] Dr. Mayer testified that a normal respiratory rate is between twelve and sixteen breaths per minute.
[7] "Tachycardic" means "relating to rapid heart rate." *Tachycardic*, Stedman's Medical Dictionary 895310 (28th ed.).
[8] "Nasotracheal" means "of, relating to, being, or performed by means of intubation of the trachea by way of the nasal passage." *Nasotracheal*, Merriam-Webster, https://perma.cc/G2R9-7RPH.

8

Despite demonstrating consciousness by following commands for the weeklong period of April 12 through April 18, 2020, Mr. Palmer was persistently somnolent[9] three days in a row, from April 19 through April 21, 2020, and did not follow commands on any of those three days. Therefore the experts were unable to conclude that he was more likely than not conscious on any of those three days.

On April 22, 2020, after medical providers withheld all sedation, Mr. Palmer's somnolence improved slowly and he was able to follow commands, demonstrating consciousness. He could not verbally communicate and was limited to grunting in response to yes or no questions. Mr. Palmer was incontinent of urine and stool and required complete assistance from his medical team to clean him and replace his condom catheter. He continued to have difficulty breathing and clearing secretions. Mr. Palmer was observed to be coughing and moving his mouth toward the suction probe to suck up oral secretions.

Mr. Palmer was conscious on April 23, 2020, as demonstrated by his ability to follow commands to move his upper and lower extremities. He could not verbally communicate, but he attempted to communicate by mouthing words, mumbling, and vocalizing intermittently. He continued to experience myoclonic jerks and twitching in his upper body.

Because Mr. Palmer's medical providers perceived he was improving, on April 24, 2020, he was transferred out of the Special Care Unit and underwent surgery to have a feeding tube placed into his stomach. Because of COVID-19 restrictions, he had no family

---

[9] According to Dr. Mayer, somnolence refers to appearing "sleepy and deactivated." In this context, somnolence is not a normal, healthy sleep state because normal sleep is reversible; Mr. Palmer's somnolent state was persistent despite efforts to engage him.

or friends present following the surgery to comfort him. He remained unable to communicate with words and could not effectively communicate his needs or ask for help.

Mr. Palmer remained conscious on April 25 and April 26, 2020. He was on a bowel regimen to manage the regularity of his bowel movements and prevent constipation. Mr. Palmer continued to experience myoclonic jerking. On April 26, 2020, a nurse brought a phone near Mr. Palmer so Mrs. Palmer could speak to him, and Mr. Palmer immediately awoke from sleeping upon hearing Mrs. Palmer's voice and attempted to lift his head. He attempted to speak to Mrs. Palmer, but he could not communicate using words.

In the early morning of April 27, 2020, Mr. Palmer was observed performing intentional movements using both upper extremities, including wiping a tear from his left eye with his left hand. He also had improved ability to squeeze the nurse's hand with his left hand and attempted communication with nods. He was incontinent of stool during a therapy session, requiring assistance from staff to clean him. He was moaning intermittently throughout his therapy sessions on April 27.

As of April 28, 2020, Mr. Palmer's cognitive state worsened as he was not able to follow commands and displayed only minimal withdrawal to painful stimuli. Because of this decline, Mrs. Palmer was permitted to see Mr. Palmer for the first time since he had been admitted to the Togus VA and subsequently MMC. She held his hand and talked to him. While she was at MMC, the attending physician met with Mrs. Palmer to discuss Mr. Palmer's goals of care and explained that his "[c]hance of recovery seem[ed] poor given [the] lack of brainstem reflexes." Mr. Palmer was not able to follow commands on April 28 or any day thereafter through his death on April 30, 2020, therefore he was not able to experience conscious pain and suffering on those three days.

On April 29, 2020, Mrs. Palmer consented to move Mr. Palmer to hospice. On April 30, 2020, Mrs. Palmer agreed to a Do Not Resuscitate order. On that same day, Mr. Palmer was transferred to Hospice of Southern Maine nursing care and passed away the same afternoon. Because of COVID-19 restrictions, during the twenty-one days Mr. Palmer was hospitalized at MMC, Mrs. Palmer was permitted to see Mr. Palmer only once, on April 28. Mrs. Palmer spent the rest of the time Mr. Palmer was hospitalized alone, waiting by the phone for daily updates about Mr. Palmer's condition. Mrs. Palmer was forced to make difficult decisions about Mr. Palmer's care.

Prior to his hospitalization, Mr. and Mrs. Palmer talked about the future and looked forward to spending time together for years to come. Mr. Palmer was sixty-nine years old at the time of his death. The parties have stipulated that but for the United States' negligence, Mr. Palmer would have lived another eleven years, to April 30, 2031. Mr. Palmer would have been eighty years old on April 30, 2031. Mrs. Palmer continues to mourn the loss of Mr. Palmer. She misses him and since his death, she carries wherever she goes a photograph of them on their wedding day so that Mr. Palmer is always close to her.

## II.   Conclusions of Law

Mrs. Palmer brings this suit under the FTCA, 28 U.S.C. §§ 1346(b), 2671 et seq. Under the FTCA, the "law of the place" where the tortious acts or omissions occurred provides the substantive law. *Id.* § 1346(b)(1); *Lozada-Manzano v. United States*, 75 F.4th 31, 38 (1st Cir. 2023). Here, the tortious conduct took place in Maine, so the Court applies Maine tort law to decide this FTCA action.

The Government concedes liability and economic damages,[10] leaving for decision only those damages for Mrs. Palmer's loss of the society, comfort, and companionship of Mr. Palmer and Mr. Palmer's conscious pain and suffering. In Maine, "[t]ort damages . . . are intended to make the plaintiff whole by compensating him or her for any injuries or losses proximately caused by the defendant." *Estate of Hoch v. Stifel*, 2011 ME 24, ¶ 41, 16 A.3d 137 (quoting *Reardon v. Lovely Dev., Inc.*, 2004 ME 74, ¶ 9, 852 A.2d 66). It is the plaintiff's burden to "establish[] facts from which the loss may be determined to a probability." *Snow v. Villaci*, 2000 ME 127, ¶ 9, 754 A.2d 360 (quoting *Currier v. Cyr*, 570 A.2d 1205 (Me. 1990)). "[A] damage award must be supported by some evidence in the record, [but] the damages need not be proved to a mathematical certainty." *Palleschi v. Palleschi*, 1998 ME 3, ¶ 6, 704 A.2d 383. "Damages that are 'uncertain, contingent, or speculative' are not recoverable." *Estate of Hoch*, 2011 ME 24, ¶ 43, 16 A.3d 137 (quoting *Wood v. Bell*, 2006 ME 98, ¶ 21, 902 A.2d 843). Mrs. Palmer's damages for the loss of comfort, society, and companionship of Mr. Palmer are subject to a statutory cap of $750,000.[11] 18-C M.R.S. § 2-807(2) (2023), *amended by* P.L. 2023 ch. 390, § 3 (effective Oct. 25, 2023). The amount of damages that may be awarded for Mr. Palmer's conscious pain and suffering is not subject to any statutory limitation.

### A. Mr. Palmer's Conscious Pain and Suffering

The Government argues that the damages award for Mr. Palmer's conscious pain and suffering should be "moderate" because he had diminished consciousness during his

---

[10] The agreed-upon damages for Mr. Palmer's economic damages are as follows: pecuniary losses are $453,066.71; medical expenses are $1,252.11; and funeral expenses are $1,096.00. The Court therefore awards to Plaintiff $455,414.82 for economic damages.

[11] The statutory cap has since been raised to $1,000,000 adjusted for inflation. 18-C M.R.S. § 2-807(2) (2024). However, this cause of action accrued before the statute was amended and the parties do not dispute that the $750,000 cap applies.

hospitalization at MMC, because the pain he felt was neither enduring nor severe due to the pain medication he received, and because the period of his conscious pain and suffering was relatively brief. To argue for a higher damages award, Mrs. Palmer points to damage amounts awarded for conscious pain and suffering in Maine and FTCA bench trials where the period of conscious suffering lasted only a few minutes.

While it is true that Mr. Palmer was treated with pain medication such that his physical pain was neither severe nor enduring, the concept of conscious suffering includes more than just physical pain but also the mental anguish that accompanies the realities of the injury. Prior to entering the Togus VA for abdominal pain and ultimately being rendered unconscious by the Government's negligence, Mr. Palmer could walk, talk, eat, and engage in all his normal activities of daily life. The next time he regained consciousness, he was at an entirely different hospital, intubated and hooked up to machines in the ICU, and unable to communicate. Mr. Palmer was isolated from Mrs. Palmer and all other family and friends throughout the rest of his conscious life.

The process of awarding noneconomic damages "is inherently difficult because the alleged injury is a subjective, unliquidated, nonpecuniary loss." *Holcombe v. United States*, 584 F. Supp. 3d 225, 287 (W.D. Tex. 2022). "[C]onverting feelings such as pain, suffering, and mental anguish into dollars is not an exact science." *Correa v. Hosp. San Francisco*, 69 F.3d 1184, 1198 (1st Cir. 1995). In FTCA cases, courts often look to previous reported damage awards to determine the claimant's recovery for noneconomic damages. Here, I carefully evaluated the comparative verdicts offered by Mrs. Palmer and the Government. *See* Pl.'s Legal Argument (ECF No. 62); Gov.'s Legal Argument (ECF No. 63). Additionally, the Court has evaluated other comparison verdicts and, for older matters, considered the value of the dollar today relative to years ago. *See Woodman v.*

*United States*, 602 F. Supp. 3d 265, 301 (D.N.H. 2022). Because the facts of each case are remarkably different from each other, however, such comparison awards are of modicum assistance.

After careful consideration, I will award Mr. Palmer, though his estate, $175,000.00 for his conscious pain, suffering and mental anguish.

### B. Mrs. Palmer's Loss of Comfort, Society, and Companionship

The Government argues the damages award for Mrs. Palmer's loss of the comfort, society, and companionship of Mr. Palmer should be far below the statutory cap. The Government argues that Mr. Palmer's life expectancy of eleven more years should cabin the damages compared to a loss of consortium claim for the loss of a younger person. Mrs. Palmer argues limiting her damages because of her and her late husband's advanced ages would constitute age discrimination and is unfounded on the record showing the couple enjoyed an intimate and companionate relationship. Like all noneconomic damages, loss of consortium damages are "notoriously difficult to quantify." *Havinga v. Crowley Towing & Transp. Co.*, 24 F.3d 1480, 1484 (1st Cir. 1994). Because of the Government's negligence, Mrs. Palmer has been and will continue to be deprived of the companionship, comfort, and society of Mr. Palmer. The evidence established that, but for the Government's negligence, the couple would have continued for eleven more years to enjoy their time together going on walks, taking day trips, celebrating holidays with family, and watching TV. I will award Mrs. Palmer $750,000 for her loss of consortium claim.

### III. Conclusion

It is accordingly ORDERED that judgment is awarded to Plaintiff Janet Palmer as personal representative of the Estate of Roy C. Palmer in the amount of $1,380,414.82.

Pursuant to 28 U.S.C. § 2678, attorney's fees are limited to twenty-five percent of this Judgment.

**SO ORDERED.**

Dated this 23rd day of April, 2025.

/s/ Stacey D. Neumann
**UNITED STATES DISTRICT JUDGE**